**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

VAJILLIAN GUTIERREZ,

      Plaintiff,

vs.                                             Case No. 8:24-cv-00047

COGNIZANT TECHNOLOGY
SOLUTIONS U.S.
CORPORATION,

      Defendant.

_____/

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, VAJILLIAN GUTIERREZ, by and through the undersigned counsel, hereby files this Complaint and Demand For Jury Trial and states in supports as follows:

## JURISDICTION AND VENUE

1.    This is an Action for Damages resulting from Fraudulent Misrepresentation.

2.    This Court has jurisdiction under 28 USC §1332 because Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

3.    Venue is proper in this Court because the unlawful conduct giving rise

to the claims herein occurred within Hillsborough County and Defendant employed Plaintiff in Hillsborough County, Florida within this District.

4.    This Court has jurisdiction over Defendant because Defendant has an operation located at 7725 Woodland Center Blvd., Tampa, Florida.

## PARTIES

5.    Plaintiff is a Citizen of Florida.

6.    Cognizant is a professional services vendor that employed approximately 800 or more workers at its Facebook content moderation site at 7725 Woodland Center Blvd., Tampa, FL 33614. Cognizant is a publicly traded corporation incorporated under the laws of Delaware, with its headquarters located at 211 Quality Circle, College Station, TX 77845.

7.    Plaintiff has been required to retain the undersigned counsel to represent her in this action and is obligated to pay them a reasonable fee for their services.

8.    Plaintiff requests a jury trial with respect to all claims.

## CONTENT MODERATION, GENERALLY

9.    Every day, Facebook users post millions of videos, images, and livestreamed broadcasts of child sexual abuse, pedophilia, rapes, torture, live kidnappings, bestiality, beheadings, dismemberments, suicides, burning bodies, racist violence, hate speech, brutality, and murder. "Content moderation" is the

practice of removing this vile online material from social networking sites or applications like Facebook and Instagram as violative of their terms of use.

10.    In August 2015, Facebook rolled out Facebook Live. Facebook Live provides a platform for users to not only post images but also livestream this horrible content including their own suicides, acts of murder or brutality, pedophilia, sexual assault, and acts of terrorism. In the context of protecting users from this kind of content, Mark Zuckerberg, co-founder of Facebook, announced on May 3, 2017:

> "Over the last few weeks, we've seen people hurting themselves and others on Facebook—either live or in video posted later. Over the next year, we'll be adding 3,000 people to our community operations team around the world – on top of the 4,500 we have today – to review the millions of reports we get every week, and improve the process for doing it quickly.
>
> These reviewers will also help us get better at removing things we don't allow on Facebook like hate speech and child exploitation. And we'll keep working with local community groups and law enforcement who are in the best position to help someone if they need it – either because they're about to harm themselves, or because they're in danger from someone else."

11.    Content moderation is conducted either electronically (through algorithms) or by human review. During all relevant times, Cognizant was in the business of supplying labor, such as Plaintiffs, to perform as human "content moderators" to review the reported offensive content—sometimes thousands of videos and images every shift—and remove those that violate Facebook's terms of use.

12.    Facebook entered into a $250-million per year contract with Cognizant to provide human content moderation services. In turn, Cognizant established call centers in relatively low-paying labor markets such as suburban Tampa (Carrollwood), Phoenix, Poland and India in order to hire and employ low-paid, unsophisticated workers with little knowledge of the technology industry to perform the grueling job of content moderation. In Tampa, Cognizant particularly targeted historically economically disadvantaged groups such as racial and ethnic minorities and veterans.

13.    Cognizant misrepresented to Plaintiff and other applicants the extreme nature, high volume and severity of the content they would be reviewing. Cognizant also misrepresented the risk of psychological harm it knew the work of content moderation of this nature posed to Plaintiff and the other applicants.

14.    Cognizant put great pressure on Plaintiff and her colleagues to review large quantities of vile content as quickly as possible and for extended periods of time in order to maximize its profits. Cognizant's compensation under the Facebook contract hinged upon satisfying Facebook's expectations that a certain amount of content be reviewed per day and that all user-reported content be reviewed within 24 hours of a report and with an overall error rate of less than one percent.

15.    From their cubicles during the overnight shift in Cognizant's Tampa office, Plaintiff and other human content moderators witnessed thousands of acts of

extreme and graphic violence per day. As one Facebook content moderator told the Guardian, "You'd go into work …, turn on your computer and watch someone have their head cut off. Every day, every minute, that's what you see. Heads being cut off."

## PROPENSITY FOR HARM

16.    Cognizant's unique system of human content moderation, when employed as intended, was highly likely to cause, or substantially contribute to, numerous human illnesses, injuries, and conditions, both mental and physical, to individuals (including Plaintiff) subjected to long-term unmitigated exposure to such content.

17.    At all material times, Cognizant knew that long-term unmitigated exposure to images and livestreaming of graphic violence and other vile content was known to cause debilitating injuries, including PTSD. Indeed, Cognizant was aware of Facebook guidance and other industry studies (described in part below) and other expert data exposing the dangers to humans of unmitigated exposure to images and livestreaming of graphic violence and other vile content. These guidance memos, studies and data were not known or readily available to Plaintiff and other applicants who were entry level workers with little knowledge of the technology industry.

18.    In a study conducted by the National Crime Squad in the United Kingdom, 76 percent of law enforcement officers surveyed reported feeling

emotional distress in response to exposure to child abuse on the internet. The same study, which was co-sponsored by the United Kingdom's Association of Chief Police Officers, recommended that law enforcement agencies implement employee support programs to help officers manage the traumatic effects of exposure to child pornography. This study was known to industry insiders (including Cognizant) but was not known or readily available to entry level workers like Plaintiff.

19.    In a study of 600 employees of the Department of Justice's Internet Crimes Against Children task force, the U.S. Marshals Service found that a quarter of the cybercrime investigators surveyed displayed symptoms related to psychological trauma, including from secondary traumatic stress. This study was known to industry insiders (including Cognizant) but was not known or readily available to entry level workers like Plaintiff.

20.    Another study of cybercrime investigators from 2010 found that "greater exposure to disturbing media was related to higher levels of . . . secondary traumatic stress" and that "substantial percentages" of investigators exposed to disturbing media "reported poor psychological well-being." This study was known to industry insiders (including Cognizant) but was not known or readily available to entry level workers like Plaintiff.

21.    The Eyewitness Media Hub has also studied the effects of viewing videos of graphic violence, including suicide bombing, and found that "40 percent

of survey participants said that viewing distressing eyewitness media has had a negative impact on their personal lives." This study was known to industry insiders (including Cognizant) but was not known or readily available to Plaintiff or other entry level workers.

22.     In June 2010, the Online Safety and Technology Working Group, an industry group established by Congress, "took note of the emotional toll incurred by employees who face the task of reviewing abhorrent images" and recommended that the federal government provide financial incentives for companies to "address the psychological impact on employees of exposure to these disturbing images." The group's recommendations were submitted to the National Telecommunications and Information Administration, which advises the White House on digital policy. This study was known to industry insiders (including Cognizant) but was not known or readily available to entry level workers like Plaintiff.

23.     The aforementioned studies were known to industry insiders (including Cognizant) but were not known or readily available to entry level workers like Plaintiff. Plaintiff was not aware of these studies when she applied for employment with Cognizant.

### COGNIZANT WAS ON NOTICE OF CONTENT MODERATION'S PROPENSITY FOR HARM TO HUMANS

24.     Aware of the dangers of long-term unmitigated content moderation, Facebook helped draft workplace safety standards to protect content moderators,

including Plaintiff, from workplace trauma and associated adverse consequences. Plaintiff was not aware of or privy to these safety standards.

25.    Facebook informed Cognizant of the dangers to humans of long-term unmitigated exposure to content moderation in the workplace, provided Cognizant the afore-stated safety standards, and required Cognizant operational leadership to: (i) implement workplace safety standards designed to protect content moderators from these dangers; and (ii) to notify employees of the dangers of content moderation. Cognizant operational leadership willfully refused to comply with either of these requirements (as described below).

26.    The workplace safety standards that Facebook required Cognizant to implement included pre-hiring psychological screening; providing moderators with robust and mandatory counseling and mental health support; altering the resolution, audio, size, and color of trauma-inducing images; and training moderators to recognize the physical and psychological symptoms of PTSD.

27.    Incorrectly assuming that Cognizant was implementing the requisite workplace safety standards as directed by Facebook, Facebook stated in a company statement that content moderators received "extensive training" that includes "on-boarding, hands-on practice, and ongoing support and training." In fact, as discussed below, Cognizant did not provide content moderators the requisite "extensive training" including "on-boarding, hands-on practice, and ongoing support and

training," thereby deliberately concealing the known dangers of its system of content moderation from Plaintiff during the onboarding phase of his employment.

28.     Facebook helped create the Technology Coalition, a collaboration of internet companies aiming "to develop technology solutions to disrupt the ability to use the Internet to exploit children or distribute child pornography." In January 2015, the Technology Coalition published an "Employee Resilience Guidebook for Handling Child Sex Abuse Images" (the "Guidebook") to address the known harms associated with moderating such content.

29.     According to the Guidebook, the technology industry "must support those employees who are the front line of this battle." The Guidebook recommends that internet companies implement a robust, formal "resilience" program to support content moderators' well-being and mitigate the effects of exposure to trauma-inducing imagery.

30.     With respect to hiring content moderators, the Guidebook recommends:

a.  In an informational interview, "[u]se industry terms like 'child sexual abuse imagery' and 'online child sexual exploitation' to describe subject matter."

b.  In an informational interview, "[e]ncourage candidate to go to websites [like the National Center for Missing and Exploited Children] to learn about the problem."

c. In follow-up interviews, "[d]iscuss candidate's previous experience/knowledge with this type of content."

d. In follow-up interviews, "[d]iscuss candidate's current level of comfort after learning more about the subject."

e. In follow-up interviews, "[a]llow candidate to talk with employees who handle content about their experience, coping methods, etc."

f. In follow-up interviews, "[b]e sure to discuss any voluntary and/or mandatory counseling programs that will be provided if candidate is hired."

31.    As a Facebook contractor, Cognizant was aware of the findings and recommendations set forth in the Guidebook and knew that implementing these recommendations could mitigate the effects of exposure to trauma-inducing imagery.

32.    With respect to safety on the job, the Guidebook recommends:

a. Limiting the amount of time an employee is exposed to child sexual abuse imagery;

b. Teaching moderators how to assess their own reaction to the images;

c. Performing a controlled content exposure during the first week of employment with a seasoned team member and providing follow up counseling sessions to the new employee;

    d.  Providing mandatory group and individual counseling sessions administered by a professional with specialized training in trauma intervention; and

    e.  Permitting moderators to "opt-out" from viewing child sexual abuse imagery.

33.    The Technology Coalition also recommends the following practices for minimizing exposure to graphic content:

    a.  Limiting time spent viewing disturbing media to "no more than four consecutive hours;"

    b.  "Encouraging switching to other projects, which will allow professionals to get relief from viewing images and comeback recharged and refreshed;"

    c.  Using "industry-shared hashes to more easily detect and report [content] and in turn, limit employee exposure to these images. Hash technology allows for identification of exactly the same image previously seen and identified as objectionable;"

    d.  Prohibiting moderators from viewing child pornography one hour before the individuals leave work; and

    e.  Permitting moderators to take time off as a response to trauma.

34.    The National Center for Missing and Exploited Children ("NCMEC")

also promulgates guidelines for protecting content moderators from psychological trauma. For instance, NCMEC recommends changing the color or resolution of the image, superimposing a grid over the image, changing the direction of the image, blurring portions of the image, reducing the size of the image, and muting audio.

## COGNIZANT FALSELY MISREPRESENTED MATERIAL FACTS RELATED TO THE DANGERS OF CONTENT MODERATION

35.     Cognizant management understands (indeed, Facebook repeatedly warned Cognizant of) the dangers to humans associated with unmitigated long-term exposure to its system of content moderation. In contrast, Plaintiff was not privy to the findings of the afore-stated industry studies or the dangers to workers associated with Cognizant's system of unmitigated long-term exposure to content moderation.

36.     Plaintiff did not know, and could not have known, of the dangers of Cognizant's content moderation system at the time she applied for the position or when she was hired.

37.     Cognizant has blithely claimed in related litigation that Plaintiff should have known of the dangers of its system of content moderation because "a simple google search for information about the position each Plaintiff was considering would have revealed significant amounts of information about the realities and dangers of content moderation." This is false. Plaintiff was not aware of any websites that would have been available to her via any type of internet search that would have

disclosed the dangers of Cognizant's content moderation system.

38.    Notably, Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, did not call Plaintiff "content moderators" but opaquely (and deceptively) called each and of them "process executives." Thus, the most logical Google search terms a new hire would have entered was "Cognizant" + "process executive." A Google search using these terms does not retrieve any websites disclosing the dangers of Cognizant's content moderation system. Instead, the only relevant search result is a generic Cognizant job posting containing no warnings about the dangers of content moderation. Thus, Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, concealed and misrepresented the nature of the job by misidentifying Plaintiff as a "process executive."

39.    Furthermore, a Google search of the terms "Facebook" + "content moderator" in November 2017 would not have retrieved any websites disclosing the dangers of Cognizant's content moderation system.

**CONTRACTUAL DUTY UNDER THE FACTS OF THE CASE**

40.    Cognizant had a contractual duty via its contract with Facebook to implement the workplace safety standards required by Facebook to protect human content moderators and a contractual duty to notify employees of the inherent dangers of its system of content moderation during the onboarding process and

throughout the Plaintiffs' employment.

41.    Based on the known dangers of Cognizant's system of content moderation, Facebook contractually required Cognizant operational leadership to provide human content moderators, including Plaintiffs, with robust and mandatory counseling and mental health support.

42.    For example, with respect to its contract with Cognizant, Facebook has publicly acknowledged that it "contracts with third-party companies [including Cognizant] for the services of content moderators. Because content moderators may be exposed to graphic imagery, Facebook requires its vendors to implement 'resiliency programs' to support their employees, which include training, counseling, and other wellness support." *Scola, et al. v. Facebook Inc.*, No. 2-18CIV05-1 (Cal. San Mateo Cty Ct. May 20, 2019) (Facebook's Motion for Judgment on the Pleadings, p. 1).

43.    Recognizing that content moderation "is not for everyone," Facebook further contractually requires its contractors to engage in a thorough "talent selection" process, including "[e]ngaging … through the interview process and selection process, making sure that folks have a high level of understanding what it is that they would be getting into," boasts Facebook's "Global Learning Leader" Brian Doegan.[1]

---

[1] https://www.vice.com/en/article/43z7gj/how-facebook-trains-content-moderators

44.    Facebook further instructed Cognizant that "we want to give folks [new hires] the opportunity to live the life of [a moderator], so that they get a realistic flavor of that" and that content moderators "always have access to resources and services and things like that at any point during this process."[2]

45.    In order to scale the content moderation program quickly, Facebook entered into "agreements" with contractors like Cognizant which "explicitly require good facilities, wellness breaks for employees, and resiliency support," says Facebook's Vice President of Global Operations, Justin Osofsky.

46.    According to Facebook's Vice President for Outsourcing, Arun Chandra, these agreements have "established a very high bar" by requiring Cognizant to "provide access to on-site counseling during all hours of operation and a 24-hour help hotline," to provide content moderators "breaks whenever they need to step away from what they're watching," and "to set up special 'resiliency areas' separate from the 'production floor.'"

47.    The reason Facebook requires Cognizant operational leadership to engage in a thorough "talent selection" process is because "[t]his job is not for everyone—so to set people up for success, it's important that we hire people who will be able to handle the inevitable challenges that the role presents," according to Facebook's Vice President of Operations, Ellen Silver.6 Ms. Silver explains that

---

[2] Id.

Cognizant was required to "screen [new hires] for resiliency." This means they must "look at a candidate's ability to deal with violent imagery for example."

### ONBOARDING REPRESENTATIONS TO PLAINTIFF

48.    During the onboarding process, Cognizant operational leadership, including Cognizant recruiter Terry Lund, Operations Leader Terry Oliver and/or the supervisors who reported to Oliver, lied to Plaintiff about the nature of content moderation by minimizing the nature of the content she would see. Plaintiff submitted to an "assessment" and viewed a sample deck of slides that Cognizant operational leadership showed to newly hired content moderators—which they called "process executives"—on a laptop computer during the new employee onboarding process.

    a.    Cognizant used Career Source to recruit Plaintiff for the content moderator position which it called a process executive. Career Source misrepresented the nature of the position and claimed it was a customer service position.

    b.    Cognizant operational leadership including Operational Leader Terry Oliver and the supervisors who reported to Oliver, instructed Eric Lund to misleadingly portray the job to Plaintiff.

    c.    On October 26, 2017, Plaintiff met with recruiter Eric Lund at the main Cognizant location in Tampa, Florida at 7725 Woodlands Center in

Hillsborough County.

d.  In the interview for the position, Mr. Lund informed Plaintiff that she was being offered the position of process executive. He explained that this position was a form of customer service in which she would be removing stuff from the internet. He explained that she would possibly see sexual images or a car wreck. He said she could see bullying or abuse of people or animals. He said she would also see lots of innocent videos of cats and bunnies, as well.

e.  He did not tell her that she would see brutal rapes or murders. He did not mention that she would be required to watch acts of sexual assault, pedophilia and child sodomy. He did not mention that she would be required to review acts of graphic violence for hours at a time. He downplayed the risk of content moderation and did not mention that there was a high risk of acquiring post-traumatic stress disorder and other psychological conditions from this type of work.

f.  Once Plaintiff was misled into believing the job was "diagnosing sentences made up of all emoji's" and evaluating social media based questions, such as "What does lol mean?" and "What does JK mean?" and to know how to send emails and search internet browsers, she was brought into the office and shown a slide deck by Cognizant operational

leadership, including Eric Lund and Operations Leader Terry Oliver and/or the supervisors who reported to Oliver.

49.    Based on the known dangers of Cognizant's system of human content moderation, Facebook contractually required Cognizant to conduct psychological screenings or evaluations of new employees, during which the employees would learn the nature of the job and it would be determined if they were psychologically fit for the extreme nature of the job. Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, deliberately refused to conduct psychological screenings or evaluations of new employees, thereby further concealing the inherent dangers of its system of content moderation from its employees.

50.    Based on the known dangers of Cognizant's system of human content moderation, Facebook required Cognizant operational leadership to train its new employees, to recognize the physical and psychological symptoms of PTSD. Facebook mandated "Hands-on Learning, including a minimum of 80 hours with a live instructor followed by hands-on practice using an actual replica of the system so new hires can practice in a "real" environment," according to Facebook's Vice President Silver.

51.    In its contract with Cognizant, Facebook further mandated that Cognizant provide pre-training instruction to "[e]ach hire [regarding] how to access

resiliency and wellness resources and gets information on how to connect with a psychologist when they need additional support."

52.     Plaintiff was never provided the requisite training as part of onboarding training. Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, deliberately refused to provide any such training to Plaintiff at any time, either before or after she was exposed to content for the first time. Cognizant's deliberate refusal to provide the training that Facebook required it to provide was intended to, and did, conceal the inherent dangers of its system of content moderation from Plaintiff.

53.     Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, deliberately refused to provide to Plaintiff any of these counselling services mandated by Facebook. Indeed, not only were counselors prohibited from providing actual counseling services, they were not even present during many of Plaintiff's workdays, in particular during the night shifts.

54.     Cognizant's deliberate refusal to provide the counseling that Facebook required it to provide was intended to, and did, conceal the inherent dangers of its system of content moderation from Plaintiff because counselling is a primary means of discovering those dangers and the impact of those dangers.

55.     Facebook also required Cognizant to provide "wellness" time that

human content moderators purportedly could use when they felt overwhelmed by the emotional toll of the job. The nine minutes per day provided by Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, for "wellness time" was woefully insufficient. If an employee exceeded the nine minutes, he or she was penalized for an "occurrence," which could serve as a basis for termination of employment.

56.    Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, deliberately refused to provide human content moderators, including Plaintiff, with the requisite robust and mandatory counseling and mental health support. Although there were counselors on staff they did not provide any real counseling services, thereby preventing Plaintiff and others from learning of the inherent dangers of Cognizant's system of content moderation and the harm it was causing them.

57.    In fact, Cognizant operational leadership, including Operations Leader Terry Oliver told supervisors to monitor how much time employees spent with counselors and to hold them to strict daily production standards regardless of their need for psychological evaluation or counseling in order to discourage use of counseling services, thereby further preventing employees from learning of inherent dangers of Cognizant's system of content moderation and obtaining treatment or counseling for the harm the suffered as a result.

58.    Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, told Plaintiff Cognizant was providing her with counseling and mental health support (as required by Facebook), but this was false. Although there were two part-time so-called "counselors" on staff to support operations of a 24/7 site with a staff level of over 500, they did not provide any real counseling services. Specifically, Cognizant contracted with different companies, including Crisis Care Network (now R3 Continuum) and Aetna, to provide "coaches" to Cognizant.

59.    Cognizant management knew the dangers of content moderation. Despite this knowledge, Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, prohibited Aetna from providing any real counseling services to Plaintiffs, thereby concealing such dangers from Plaintiffs.

60.    Although Plaintiff was told she would be provided counseling, the coaches in turn were told by Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, that they were not there to perform counseling. These coaches were falsely portrayed to Plaintiff by Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, as "counselors" who could provide mental health support to them (as required by the Facebook standards) but, in reality, these coaches

were prohibited from counseling. The coaches were not allowed to have pen, paper, telephone or computer so there was no way of recording events (and they, too, were bound by NDAs). By misrepresenting to Plaintiff that she would be provided "counseling," Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, misrepresented a material fact in order to prevent Plaintiff from learning of the inherent dangers and the harm it was causing her.

61.    Not only did Cognizant not provide Plaintiff with meaningful on-site counseling (as required by Facebook), but it actually utilized the counseling for the reprehensible purpose of terminating employees who began to manifest symptoms of psychological trauma. For example, the identity of the employees who attended these counseling sessions—as well as the content of the sessions themselves (which clearly should be confidential under HIPAA and the therapist-patient privilege)— were disclosed to Cognizant Human Resources and/or Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, without employees such as Plaintiff's knowledge or consent.

62.    Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, required the counselors to provide management information about the content of the counseling sessions so that management could review and utilize this information to evaluate which employees

were to be terminated due to the extent of their mental health complications as related in the confidential information.

63.    Even in the absence of an initial duty, if one undertakes to disclose facts within his knowledge "he must disclose the whole truth." *Ramel v. Chasebrook Const. Co.*, 135 So. 2d 876, 882 (Fla. 2d DCA 1961); *see also Gutter v. Wunker*, 631 So. 2d 1117, 1118-19 (Fla. 4th DCA 1994) ("[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed."); *Nicholson v. Kellin*, 481 So. 2d 931, 936 (Fla. 5th DCA 1985) ("[E]ven assuming that a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth.").

64.    As discussed herein, Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, disclosed some facts regarding its system of content moderation (e.g. that they would be reviewing emojis, mild graphic still images (not livestreaming or videos), such as two pictures of guys in underwear, a picture of female breasts, pictures of cartel members (but nothing was happening), and mild hate speech (not videos)), but did not disclose "the whole truth"; rather, they misrepresented the material facts regarding its extreme dangers in an intentional and fraudulent fashion.

65.    As explained above, in its contract with Facebook, Cognizant promised

to provide to Plaintiffs information regarding the dangers of its system of content moderation during the onboarding process and throughout their employment.

66.    Like the tobacco companies, Cognizant "t[ook] on the duty to disclose by promising to share" information regarding the injurious nature of content moderation with new hires, including Plaintiffs. Cognizant breached that duty when operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, deliberately misrepresented that information to Plaintiff.

67.    Even if Cognizant had not taken on a duty to disclose the injurious nature of its system of content moderation to Plaintiff by promising to Facebook to share this information with its process executives (which it did), a separate and distinct source of this duty arises from the fact that Plaintiff was a third-party beneficiary of the contract with Facebook. "The question whether a contract was intended for the benefit of a third person is generally regarded as one of construction of the contract. The intention of the parties in this respect is determined by the terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish." *AR Moyer, Inc. v. Graham*, 285 So. 2d 397, 402 (Fla. 1973).

68.    Plaintiff was an intended beneficiary of Cognizant's contract with Facebook. The multiple contract provisions requiring Cognizant to implement the

requisite workplace safety standards for the content moderators was expressly for the benefit of Plaintiff and other applicants and one under which it clearly appears that they were a beneficiary.

## COUNT I
### (Fraudulent Misrepresentation)

69.    Plaintiff repeats the allegations set forth in Paragraphs 1 through 68 as though fully set forth herein.

70.    As set forth in greater detail above, Cognizant's system of human content moderation, when employed as intended, was highly likely to cause, or contribute to in substantial fashion to, numerous human illnesses, injuries, and conditions, both mental and physical, to the content moderators it employed.

71.    As set forth in greater detail above, Cognizant knew that its system of human content moderation, when employed as intended, was highly likely to cause, or contribute to in substantial fashion to, numerous human illnesses, injuries, and conditions, both mental and physical, to the content moderators it employed.

72.    As set forth in greater detail above, Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, made false statements to Plaintiff during the onboarding process and during Plaintiff's early phases of employment concerning the dangers its system of human content moderation posed to Plaintiff and other applicants.

73.    As set forth in greater detail above, Cognizant Operations Leader Terry

Oliver and the supervisors who reported to Oliver, knew the statements they were making to Plaintiff concerning the dangers of its system of human content moderation were false.

74. As set forth in greater detail above, Cognizant Operations Leader Terry Oliver and the supervisors who reported to Oliver, intended that the misrepresentations they made to Plaintiff concerning the dangers of its system of human content moderation induce Plaintiff to unwittingly expose herself to those dangers by accepting and retaining employment as "process executives."

75. As set forth in greater detail above, in making her decisions regarding obtaining or retaining employment under Cognizant's system of content moderation, Plaintiff relied on information contained in the misrepresentations by Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, regarding the dangers of its system of human content moderation.

76. As set forth in greater detail above, Plaintiff detrimentally relied on the misrepresentations by Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, regarding the dangers of its system of human content moderation when she accepted the job and continued to perform in the dangerous role unaware of the psychological toll it was having on her. Plaintiff would not have accepted the "process executive" position or

continued with the role if Cognizant operational leadership, including Operations Leader Terry Oliver and the supervisors who reported to Oliver, had disclosed the true nature of the job and the impact it was having and would continue to have on Plaintiff's mental health.

77.    As a direct and proximate result of the conduct described above, Plaintiff became subjected to the dangers of Cognizant's system of human content moderation. As a direct and proximate result of Cognizant's conduct as described in the preceding paragraphs, Plaintiff was injured and continues to suffer psychological trauma and related physical harm.

78.    As a result of constant and unmitigated exposure to highly toxic and extremely disturbing images through Cognizant's system of human content moderation, Plaintiff developed and suffers from significant psychological trauma, PTSD, C-PTSD, as well as associated physical injuries.

WHEREFORE, Plaintiff, VAJILLIAN GUTIERREZ, requests that this Court:

   a.  Award Plaintiff actual and compensatory damages, including but not limited to lost pay, medical expenses, lost future earning capacity, emotional distress and loss of enjoyment of life;

   b.  Award declaratory and injunctive relief as is necessary to protect the interests of Plaintiff, including by enjoining Cognizant from continuing

to conduct business through the unlawful and unfair practices alleged herein;

c.  Award Plaintiff exemplary and punitive damages;

d.  Award Plaintiff her reasonable litigation expenses pursuant to applicable law; and

e.  Award any further relief that the Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all counts so triable.

Dated this 4th day of January, 2024.

Respectfully submitted

*/s/ Gary L. Printy, Jr.*
GARY L. PRINTY, JR. Esq.
Florida Bar No. 41956
The Printy Law Firm
5407 N Florida Ave
Tampa, FL 33604
(P): (813) 434-0649
(F): (813) 423-3722
garyjr@printylawfirm.com
*Attorney for Plaintiff*
Vajillian Gutierrez